UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MICHAEL HUND,

        Plaintiff,

    v.                                                    20-cv-1176 (JLS)

GOVERNOR ANDREW M. CUOMO, in
his official capacity as Governor of New
York State, and VINCENT G.
BRADLEY, in his official capacity as
Chairman of the State Liquor
Authority,

        Defendants.

---

## DECISION AND ORDER

New York State has responded to the COVID-19 pandemic with numerous restrictions.  This case involves one such restriction, set forth in the New York State Liquor Authority's Phase 3/4 Guidelines for Licensed On-Premises Establishments.  The Court must decide if the incidental-music rule contained in these guidelines—which allows licensed establishments to provide live music that is incidental to the dining experience but not advertised, ticketed live music—comports with the United States Constitution.  Because it does not, the Court grants Plaintiff's motion for a preliminary injunction, as set forth in detail below, and grants in part and denies in part Defendants' motion to dismiss the complaint.

## BACKGROUND

### I.     Procedural History and Factual Background

Musician Michael Hund filed this lawsuit on August 31, 2020.  Dkt. 1.  He alleges claims against Defendants Andrew M. Cuomo and Vincent G. Bradley, in their official capacities as the Governor of New York State and the Chairman of the State Liquor Authority, for violations of the United States Constitution.  *See id.* Specifically, Hund claims violations of the: (1) First Amendment; (2) Due Process Clause of the Fourteenth Amendment; and (3) Takings Clause of the Fifth Amendment.  *See id.* at 14-17.[1]  He also references his rights under the Fourteenth Amendment's Equal Protection Clause.  *See id.* ¶ 23.  He seeks preliminary and permanent injunctions and $100,000 in damages.  *See id.* at 17.

Hund "operates his business by coordinating and contracting with venues, including those within New York State, to offer, advertise, and perform at live musical events for which tickets are sold to fans of his music."  Dkt. 1 ¶ 4.  His claims stem from the New York State Liquor Authority's Phase 3/4 Guidelines for Licensed On-Premises Establishments (the "SLA Guidelines"), which Defendant Bradley promulgated in connection with Defendant Cuomo's Executive Orders regarding COVID-19.  *See* Dkt. 1 ¶ 18.

---

[1] Unless otherwise noted, page references are to the numbering that appears in the footer of each page, and not to the numbering automatically generated by CM/ECF.

The relevant portion of the SLA Guidelines provides:

**Q: Can I have live entertainment or a DJ in my indoor or outdoor dining area?**

A: Restaurants and other on premises food and beverage establishments that have a license through the SLA are only allowed to offer on-premise music if their license certificate specifically allows for such activity (i.e., live music, DJ, recorded, etc.). A manufacturer that has an on premises license also must assure that its on premises license certificate specifically allows for the type of music it is offering. A manufacturer without a separate on premises license may offer music unless its license certificate specifically prohibits such music.

If offering music, indoors or out, all relevant aspects of the respective Department of Health guidance dining must be followed, e.g., patrons should not be standing except for necessary reasons (e.g., restroom, entering/exiting), standing patrons should wear face coverings, etc. Performers should be at least 12 feet from patrons.

All other forms of live entertainment, such as exotic dancing, comedy shows, karaoke etc., are not permissible currently regardless of phase.

*Additionally, please note that only incidental music is permissible at this time. This means that advertised and/or ticketed shows are not permissible. Music should be incidental to the dining experience and not the draw itself.*

*See* Dkt. 9-2, at 4 (emphasis added). Hund challenges the emphasized portion of the above excerpt, which the Court will refer to as the incidental-music rule.

On September 16, 2020, Hund moved for a preliminary injunction and a temporary restraining order, seeking to enjoin Defendants from enforcing the incidental-music rule. *See* Dkts. 7-2, 9. The Court held a status conference on September 23, 2020. Dkt. 10. At the conference, the Court told Hund that it would consider his motion for a temporary restraining order and a preliminary injunction

together, and would decide them after considering both parties' arguments. Defendants shared that they would move to dismiss the complaint, so the Court set a coordinated briefing schedule on all motions.  *See* Dkt. 10.

Defendants moved to dismiss the complaint on September 30, 2020, arguing that the Court lacks subject-matter jurisdiction and that Hund's claims fail on the merits, and opposed Hund's motion for preliminary injunction.  *See* Dkts. 13, 14. Hund opposed Defendants' motion to dismiss and replied in support of his motion for a preliminary injunction.  *See* Dkts. 22, 23.  And Defendants replied in support of their motion to dismiss.  *See* Dkt. 25.

On November 3, 2020, the Court held oral argument on both motions, at which it reserved decision and told the parties it would issue a written decision and order.  *See* Dkt. 26.[2]

## II.    <u>Regulatory Backdrop and Concerns about Non-Incidental Music</u>

The facts and circumstances surrounding the ongoing COVID-19 pandemic are well-known and well-documented, and the Court will not restate them here.  It will, however, briefly discuss the regulatory backdrop relevant to Hund's claims.

Over the course of the pandemic, Defendant Cuomo has issued a series of Executive Orders regarding COVID-19.  These Executive Orders imposed restrictions on, and issued directives to, various industries and sectors of the

---

[2] At several points during the briefing schedule, the parties requested extensions of time, each of which the Court granted.  *See* Dkts. 16, 17, 18, 19, 24.

economy—and, later, relaxed certain restrictions.  The SLA Guidelines supplement, but do not replace or supersede, the Executive Orders.  *See* Dkt. 9-2, at 1 ("This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.").

The SLA Guidelines apply to "Licensed On-Premises Establishments (e.g. restaurants, bars, taverns, clubs, catering establishments, manufacturers with on-premises privileges, etc.) located in regions that have reached Phase 3 . . . ."  *See* Dkt. 9-2, at 1.  In other words, the SLA Guidelines apply to establishments that are licensed by the State Liquor Authority.

The SLA Guidelines explicitly state that the Food Service Guidelines for Employers and Employees apply to covered establishments, as well.  *See* Dkt. 9-2, at 1.  Examples of additional mandatory restrictions that apply across the board include: (1) occupancy restrictions; (2) distancing of tables or, alternatively, erection of barriers; (3) employee face-covering requirements; (4) requirement that patrons wear face coverings at all times except when seated at their tables; (5) maximum per-table capacity; (6) separately-designated entrances and exits for employees and patrons; (7) adherence to CDC and Department of Health cleaning and disinfecting guidelines; (8) maintaining hand hygiene stations; and (9) screening employees for COVID-19 symptoms and exposure.  *See* Reopening New York: Food Services Guidelines for Employers and Employees (last visited Nov. 12, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Food_Services_Summary_Guidelines.pdf.  The SLA Guidelines make clear that they do not replace

5

the Food Service Guidelines, and that the Food Service Guidelines apply to all licensed establishments alongside the SLA Guidelines.

The Amended Declaration of Elizabeth M. Dufort, M.D, FAAP, which Defendants submitted in opposition to Hund's motion for a preliminary injunction, discusses the evolution of COVID-19 in New York, the regulatory scheme that applies to venues like the licensed establishments covered by the incidental-music rule, and the concerns that motivated the incidental-music rule. *See* Dkt. 20.  In particular, Dr. Dufort explains that incidental music is allowed—but advertised, ticketed live performances are not—because incidental music does not pose the same risks of: (1) coordinated arrival and departure times; (2) congregation and mingling; (3) length of time spent at the venue and related increase in alcohol consumption; (4) number of patrons; and (5) singing or shouting by patrons. *See id.* ¶¶ 68, 69, 73, 74, 82, 83, 84, 95.  In sum, Dr. Dufort characterizes the advertised, ticketed live musical performances prohibited by the incidental-music rule as potential super-spreader events for COVID-19.  *See id.* ¶¶ 98-101.

## ANALYSIS

### III.   Defendants' Motion to Dismiss

#### A.    Motion to Dismiss Standards

Federal Rule of Civil Procedure 12(b)(1) requires courts to dismiss claims that they lack statutory or constitutional power to adjudicate.  *See* Fed. R. Civ. P. 12(b)(1); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A plaintiff

who asserts that subject-matter jurisdiction exists has the burden of proving

subject-matter jurisdiction by a preponderance of the evidence. *Makarova*, 201 F.3d

at 113.

To survive a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), a plaintiff must allege facts that—accepted as true—are sufficient to "state

a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The

complaint need not contain detailed factual allegations but, "at a bare minimum,"

must "provide the grounds upon which his claim rests through factual allegations

sufficient to raise a right to relief above the speculative level." *Yang Zhao v. Keuka

Coll.*, 264 F. Supp. 3d 482, 490 (W.D.N.Y. 2017) (quoting *Goldstein v. Pataki*, 516

F.3d 50, 56 (2d Cir. 2008)).

When faced with motions to dismiss under both Rule 12(b)(1) and Rule

12(b)(6), courts  should consider the Rule 12(b)(1) challenge first because it relates

to subject-matter jurisdiction. *See, e.g.*, *Capellupo v. Webster Cent. Sch. Dist.*, No.

13-CV-6481 EAW, 2014 WL 6974631, at *2 (W.D.N.Y. Dec. 9, 2014); *Frederick v.

New York*, 232 F. Supp. 3d 326, 331 (W.D.N.Y. 2017) ("A motion questioning the

Court's subject matter jurisdiction must be considered before other challenges since

the Court must have jurisdiction before it can properly determine the merits of a

claim.") (internal quotations and citation omitted).

## B.     Subject-Matter Jurisdiction

Defendants argue that the Court lacks subject-matter jurisdiction over Hund's claims for various reasons.  First, Defendants argue that Hund lacks standing to challenge the SLA Guidelines.  *See* Dkt. 13-1, at 7-10.  Second, Defendants argue that sovereign immunity bars (1) the compensatory damages portion of Hund's takings claim against Defendants, and (2) his request for prospective injunctive relief against Defendant Cuomo.  *See id.* at 16-19.

For the reasons discussed below, Hund has standing to challenge the SLA Guidelines, but sovereign immunity bars certain aspects of his claims.

### 1.     Hund's Standing to Challenge the SLA Guidelines

Standing relates to a court's constitutional power to hear and decide a case and, therefore, implicates subject-matter jurisdiction.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Capellupo*, 2014 WL 6974631, at *2.

A plaintiff has standing to raise a claim if he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision" on that claim.  *Spokeo*, 136 S. Ct. at 1547; *see also SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).  At the pleading stage, the plaintiff must clearly allege facts to support each element.  *See Spokeo*, 136 S. Ct. at 1547; *SM Kids*, 963 F.3d at 210.

An injury in fact exists where plaintiff "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defs. of*

8

*Wildlife*, 504 U.S. 555, 560 (1992)).  A particularized injury "affect[s] the plaintiff in a personal and individual way."  *Id.* (internal quotations and citation omitted).  To be sure, the plaintiff's injury must be direct, and a plaintiff "may not raise the rights of a third-party."  *See N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1347 (2d Cir. 1989).  But a plaintiff need not be the target of the challenged conduct to suffer a direct and personal injury sufficient to establish standing.  *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 112-13 (1976) (concluding that physicians "suffer[ed] concrete injury from the operation of the challenged statute" restricting abortion access because they "allege[d] that they have performed and will continue to perform operations for which they would be reimbursed . . . , were it not for the limitation" in the statute).

Against this standard, Hund has standing to challenge the incidental-music rule.  Hund alleges that he is a musician "who operates his business by coordinating and contracting with venues, including those within New York State, to offer, advertise, and perform at live musical events for which tickets are sold to fans of his music."  Dkt. 1 ¶ 4.  He alleges that he was injured by the incidental-music rule because certain "previously booked shows . . . have . . . been cancelled and will continue to be cancelled."  *Id.*; *see also id.* ¶ 12 (alleging that the incidental-music rule has "prevented . . . [him] . . . from earning a living").  SLA-licensed venues—rather than musicians, like Hund, who perform live, advertised, ticketed shows at those venues—may be the incidental-music rule's target.  *See* Dkt. 13-1, at 8-9.  But the incidental-music rule undoubtedly affects Hund in a "personal and individual

way," which confers standing sufficient to withstand Defendants' motion to dismiss. *See Spokeo*, 136 S. Ct. at 1548; *see also Singleton*, 428 U.S. at 112-13.

Hund also demonstrates that his injury is "fairly traceable" to the incidental-music rule and is "likely to be redressed by a favorable judicial decision," by alleging that he plays advertised, ticketed live shows, that such shows have been cancelled and will continue to be cancelled, and that some cancelled shows were scheduled at bars and restaurants. *See Spokeo*, 136 S. Ct. at 1547; Dkt. 1 ¶¶ 4, 23. These allegations are sufficient to establish standing.

### 2.   Eleventh Amendment Prohibition

Hund names as defendants two state officials, in their official capacities. *See* Dkt. 1 ¶¶ 5, 6. The Court therefore must consider whether the Eleventh Amendment bars his claims.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend. XI. Despite "the limited terms of the Eleventh Amendment, . . . federal court[s] [can]not entertain a suit brought by a citizen against his own State." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)).

Hund seeks damages on his takings claim. *See* Dkt. 1 ¶ 46. Where "a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that

awards retroactive monetary relief."  *Pennhurst*, 465 U.S. at 102-03.  Thus, the damages portion of Hund's takings claim against Defendants in their official capacities fails.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (holding that the Eleventh Amendment's bar on damages against a state in federal court "remains in effect when State officials are sued for damages in their official capacity"); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (affirming dismissal of "claims for damages against all of the individual defendants in their official capacities . . . because these claims are barred by the Eleventh Amendment").

This analysis does not change because Hund seeks damages on a takings claim.  In particular, "the Fifth Amendment does not abrogate sovereign immunity." *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020) (holding that Eleventh Amendment barred a takings claim for damages, and that *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), did not require a different conclusion); *see also Williams v. Utah Dep't of Corrs.*, 928 F.3d 1209, 1214 (10th Cir. 2019) (concluding that the Eleventh Amendment barred a takings claim, noting that "*Knick* did not involve Eleventh Amendment immunity, which is the basis of our holding in this case"); *Canada Hockey LLC v. Texas A&M Univ. Athletic Dep't*, No. 4:17-CV-181, 2020 WL 5345390, at *8 (S.D. Tex. Sept. 4, 2020) (considering motion for reconsideration in light of *Knick* and "reaffirm[ing] [the] conclusion that sovereign immunity deprives the [c]ourt of jurisdiction to hear Plaintiffs' takings claim under the Fifth Amendment's Takings Clause"); *Cmty. Hous. Improvement Program v.*

11

*City of N.Y.*, Nos. 19-cv-4087(EK)(RLM), 19-cv-6447(EK)(RLM), 2020 WL 5819900, at *4 (E.D.N.Y. Sept. 30, 2020).

It remains an open question whether the same conclusion would apply if a remedy for a taking were unavailable in state court. *See Cmty. Hous.*, 2020 WL 5819900, at *3; *Manning v. N.M. Energy, Mins. & Nat. Res. Dep't*, 144 P.3d 87, 91-92, 94-95 (N.M. 2006). Because Hund does not claim that he is without a remedy in New York's courts, the Court need not decide that question here. The Eleventh Amendment bars his claim for damages.

Hund also seeks prospective injunctive relief against Defendants on each claim. *See* Dkt. 1 ¶¶ 32, 38, 45. Such claims are excepted from the Eleventh Amendment's prohibition if the named state officer had "some connection with the enforcement of the act." *Ex Parte Young*, 209 U.S. 123, 157 (1908). A state officer who is "expressly directed to see to . . . enforcement" of the challenged statute or rule has such a connection. *Id.* A governor does not meet this exception solely "based upon the theory that [he or she], as the executive of the state, was, in a general sense, charged with the execution of all its laws." *Id.* If, however, the state official is charged with enforcing a rule or statute and his or her enforcement violates the Constitution, the Eleventh Amendment does not insulate him or her from liability. *See id.* at 159-60.

Hund alleges that Defendant Cuomo issued Executive Orders imposing various restrictions in response to the COVID-19 pandemic. *See, e.g.*, Dkt. 1 ¶¶ 11, 12, 22. But he alleges that Defendant Bradley—not Defendant Cuomo—

promulgated the SLA Guidelines and the incidental-music rule they contain.  *See id.* ¶ 19.  Hund also alleges that Defendant Bradley has the responsibility to enforce the incidental-music rule and has done so.  *See id.* ¶¶ 14, 15.  He alleges neither that Defendant Cuomo has the authority to enforce the incidental-music rule nor that Defendant Cuomo has enforced the rule.  *See generally* Dkt. 1.

Absent enforcement authority regarding the incidental-music rule, Defendant Cuomo is immune from Hund's claims under the Eleventh Amendment.  But the *Ex Parte Young* exception to sovereign immunity applies to Defendant Bradley, who may enforce, and has enforced, the incidental-music rule.  Accordingly, Hund's claims against Defendant Cuomo are dismissed.  His claims for prospective injunctive relief against Defendant Bradley survive.

## C.  **Hund's First Amendment Claim**

Hund alleges that the incidental-music rule is an "impermissible and unconstitutional content-based restriction," and that "advertising is a form of expression." Dkt. 1 ¶ 30.  Bradley[3] assumes that Hund's First Amendment claim involves commercial speech and focuses on the advertising portion of the incidental-music rule, arguing that the complaint does not state a claim for violating Hund's commercial speech rights.  *See* Dkt. 13-1, at 19-23.

To begin, the incidental-music rule does not prevent Hund from advertising lawful performances.  The incidental-music rule—and the SLA Guidelines,

---

[3] Because the Court dismisses Defendant Cuomo, the Court will refer only to the remaining defendant—Defendant Bradley—going forward.

generally—apply to "Licensed On-Premises Establishments (e.g. restaurants, bars, taverns, clubs, catering establishments, manufacturers with on-premises privileges, etc.)." Dkt. 9-2, at 1. The incidental-music rule portion of the SLA Guidelines, which states that "advertised and/or ticketed shows are not permissible," prohibits those licensed on-premises establishments from hosting advertised and/or ticketed shows. *See id.* at 4.

On its face, the incidental-music rule does not prevent Hund, a musician, from advertising performances. *See id.* Bradley acknowledges this fact. *See* Dkt. 25, at 1. Commercial speech, therefore, is not the proper focus of Hund's First Amendment claim.

But the incidental-music rule affects Hund's ability to perform live music as part of advertised, ticketed events at licensed on-premises establishments, implicating his First Amendment rights. *See* Dkt. 1 ¶ 4; *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment."); *Bery v. City of N.Y.*, 97 F.3d 689, 694 (2d Cir. 1996) ("The First Amendment shields more than political speech and verbal expression; its protections extend to . . . music, without regard to words . . . .").

The First Amendment, which applies to states through the Fourteenth Amendment's Due Process Clause, provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996).

At the outset, the Court must determine whether the incidental-music rule is a content-based or content-neutral regulation of speech. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015); *Ward*, 491 U.S. at 791-92; *Robar v. Vill. of Potsdam Bd. of Trs.*, No. 8:20-CV-0972 (LEK/DJS), 2020 WL 5633824, at *7 (N.D.N.Y. Sept. 21, 2020). To do this, the Court must decide "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791; *see also Reed*, 576 U.S. at 163-64 (holding that regulation is content-based if it "applies to a particular speech because of the topic discussed or the idea conveyed," or "cannot be justified without reference to the content of the regulated speech") (internal quotations and citation omitted).

In other words, a "regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 98 (2d Cir. 2006) (internal quotations and citation omitted). If "a regulation 'serves purposes unrelated to the content of expression,' it [is] content-neutral, 'even if it has an incidental effect on some speakers or messages but not others.'" *Id.* (quoting *Ward*, 491 U.S. at 791).

Hund implicitly acknowledges that the incidental-music rule is content-neutral, by alleging that Bradley promulgated the SLA Guidelines that include the incidental-music rule pursuant to Defendant Cuomo's Executive Orders related to COVID-19. *See* Dkt. 1 ¶ 18; *see also id.* ¶ 31 (disputing that SLA Guidelines are data-based but noting that Defendants justified the SLA Guidelines as necessary based on increased COVID-19 cases). Because "the justification for the [incidental-

music rule] 'has nothing to do with content,'" it is content neutral.  *See Ward*, 491

U.S. at 792 (quoting *Boos v. Barry*, 485 U.S. 312, 320 (1988)).

Content-neutral restrictions ordinarily trigger intermediate scrutiny to

determine compliance with the First Amendment.  Here, the parties vigorously

dispute the extent to which *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), applies

and, if it applies, whether it supplants intermediate scrutiny.  *See generally* Dkt. 13,

at 11-14; Dkt. 22, at 12-15; Dkt. 25, at 3-4.  Because the incidental-music rule fails

under *Jacobson*'s deferential review, as well as the heightened review that

otherwise would apply to Hund's First Amendment claim, the Court analyzes the

claim under both.

### 1.   *Jacobson v. Massachusetts* Review

The United States Constitution permits state officials to take necessary,

rational, and temporary measures to meet an emergency.  Indeed, when exercised

within constitutional limits, a state's traditional police powers over public health

matters, recognized by the Tenth Amendment, stand in equipoise with the rights

enshrined elsewhere in the Constitution.  And more than a century of caselaw

illustrates that, in extreme times, like when a pandemic or epidemic threatens to

impose a heavy toll on public health, this equipoise will flex—without breaking—to

tolerate state impositions that are moderate in severity, short in duration, and

tailored to the disease.  *See Jacobson*, 197 U.S. at 29 (holding that "in every well-

ordered society charged with the duty of conserving the safety of its members[,] the

rights of the individual in respect of his liberty may at times, under the pressure of

great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand"); *In re Smith*, 40 N.E. 497 (1895); *Ho v. Williamson*, 103 F. 10 (C.C. N.D. Cal. 1900); *Benton v. Reid*, 231 F.2d 780 (D.C. Cir. 1956); *Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016).

Even in a pandemic, state police powers are subject to limitations, and state action taken to protect public health cannot infringe constitutional rights. *See Jacobson*, 197 U.S. at 28, 31, 38-39; *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1179 (11th Cir. 2020) ("[J]ust as constitutional rights have limits, so too does a state's power to issue executive orders limiting such rights in times of emergency.").

In particular:

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Jacobson*, 197 U.S. at 31. Stated differently, a state's police powers "may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression." *Id.* at 38.

State action deviates from having a "real or substantial relation" to the public health if "exercised in particular circumstances and in reference to particular persons" in "an arbitrary, unreasonable manner." *Jacobson*, 197 U.S. at 28. States exceed the bounds of their police power when they "go so far beyond what was

reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id.*

For this reason, and because "the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land" without this judicial review, courts must stand guard against impermissible encroachments on freedoms. *Sterling v. Constantin*, 287 U.S. 378, 397 (1932).

The incidental-music rule prohibits one kind of live music and permits another. This distinction is arbitrary. With either type of live music, table-spacing, social-distancing, and face-covering requirements remain the same. *See* Dkt. 9-2, at 1. Bradley allows incidental music. *See id.* at 4. And he allows trivia night at the same establishments. *See id.* at 5. Plus, New York movie theaters may open, subject to certain restrictions. *See* Dkt. 25-1, at Ex. B. Those activities pose the same exposure concerns that Dr. Dufort highlights regarding live, advertised, ticketed musical performances. *See* Dkt. 20 ¶¶ 68, 69, 73, 74, 82, 83, 84, 95.

In fact, trivia nights and attending movies at a theater would seem to trigger the same common arrival and departure time concern that Bradley cites regarding advertised, ticketed musical performances. Similarly, Bradley cites concerns about ticketed, advertised musical performances resulting in more time spent at tables compared to a quick dinner over incidental music—for example, 3 hours versus 90 minutes. But many restaurants often accommodate a slower-paced dinner. And if Bradley's goal is a 90-minute turnaround, twice as many patrons would seem to result, which would increase—not decrease—the risk of COVID-19 spread.

The distinctions drawn here have no real or substantial relation to public health.  They are arbitrary.  Because there is no difference in logic—under any standard—for these distinctions, the incidental-music rule does not pass muster under *Jacobson*.

### 2.     Intermediate Scrutiny Review

The incidental-music rule also fails under the less deferential intermediate scrutiny that applies to time, place, or manner restrictions.

A content-neutral regulation "may limit the time, place, or manner of expression . . . so long as the restrictions are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information."  *Mastrovincenzo*, 435 F.3d at 98; *see Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007).[4]

 A regulation is "narrowly tailored" if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Mastrovincenzo*, 435 F.3d at 98 (quoting *Ward*, 491 U.S. at 798) (internal quotations

---

[4] The existence of a significant government interest is not in dispute.  Hund acknowledges that the restrictions enacted by New York State officials, including Bradley, aim to "control[] the spread of Covid-19."  *See* Dkt. 1 ¶ 12; *see also id.* ¶ 16 (alleging that Defendant Cuomo "attempts to justify continued shutdowns due to spikes or upticks in 'cases'"); *id.* ¶ 18 (alleging that Defendant Bradley promulgated the SLA Guidelines and its incidental-music rule "pursuant to Defendant Cuomo's executive orders").  Indeed, the SLA Guidelines that contain the incidental-music rule include numerous references to COVID-19 and the associated public-health concerns.  *See* Dkt. 9-2.  There is little doubt that the incidental-music rule is born from a significant government interest: safeguarding the public health from COVID-19.  The question remains whether the incidental-music rule is narrowly tailored to this interest.

and emphasis omitted).  The government has the burden of establishing narrow tailoring.  *See McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

The narrow-tailoring requirement does not require the government to choose the least restrictive or intrusive means of achieving its stated interest.  *See Mastrovincenzo*, 435 F.3d at 98.  But the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not advance its goals."  *Vincenty*, 476 U.S. at 84 (quoting *Ward*, 491 U.S. at 799).  In other words, the regulation must "focus[] on the source of the evils the [government] seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils."  *Id.* at 84-85 (quoting *Ward*, 491 U.S. at 799 n.7).

The incidental-music rule is not narrowly tailored to serve the government's interest in protecting public health.  Restaurants, bars, and other SLA-licensed establishments covered by the incidental-music rule are subject to robust precautions designed to protect against COVID-19.  *See* Dkt. 1 ¶ 12 ("During the pandemic, venues, including those that offer music[,] are still following and adhering to guidelines requiring a maximum of seating at tables, mandatory food service with alcohol purchases, early closing times, social distancing and mask policies, etc. . . . "); Dkt. 9-2 (incorporating by reference the Food Service Guidelines for Employers and Employees).  The stated public-health concern behind the incidental-music rule is that live, advertised, ticketed events risk becoming super-spreader events based on coordinated arrival and departure times, increased

mingling and congregation, increased time at the venue (during which more alcohol is consumed), and greater opportunity for singing and shouting that music incidental to dining does not present.  *See* Dkt. 20 ¶¶ 68, 69, 73, 74, 82, 83, 84, 95.

Even assuming that the incidental-music rule were not arbitrary as discussed above, and, indeed, mitigated those risks, it does so at the expense of burdening Hund's First Amendment rights.  In other words, regardless of any mitigating effect that banning advertised, ticketed events has on COVID-19 spread, the ban "significantly restrict[s] a substantial quantity of speech that does not create the same evils" Bradley seeks to prevent.  *See Vincenty*, 476 F.3d at 84-85 (quoting *Ward*, 491 U.S. at 799 n.7).  Bradley may impose measures to guard against COVID-19 transmission without unduly restricting Hund's First Amendment rights, much like he did with trivia night events at SLA-licensed establishments, which are allowed under the SLA Guidelines even though they implicate the same coordinated arrival- and departure-time concern, among other similarities.

In sum, because the incidental-music rule fails *Jacobson* review, as well as intermediate scrutiny review, Hund states a First Amendment claim—specifically, for an impermissible time, place, or manner restriction—that survives Bradley's motion to dismiss.[5]

---

[5] The Court recognizes that Bradley submitted Dr. Dufort's declaration in opposition to Hund's motion for preliminary injunction, and that it is material outside the corners of the complaint.  Even giving Bradley the benefit of the justification for the incidental-music rule advanced by Dr. Dufort, Hund's First Amendment claim survives Bradley's motion to dismiss.

### D.    Hund's Due Process Claims

The Fourteenth Amendment's Due Process Clause provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  It protects "the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (internal quotations and citations omitted).

Hund claims that the incidental-music rule violates his substantive due process rights because it hinders his ability to earn a living in his chosen profession—*e.g.*, as a musician.  *See* Dkt. 1 ¶ 37.  He also claims that the rule violates his procedural due process rights because he is without a remedy to challenge the adverse impact on his ability to pursue his profession as a musician. *See id.*; *see also* Dkt. 23, at 27-30.  The Court addresses each claim below.

### 1.    Substantive Due Process

Substantive due process "is an outer limit on the legitimacy of governmental action."  *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999); *see also Scaccia v. Stamp*, 700 F. Supp. 2d 219, 235 (N.D.N.Y. 2010) (stating that substantive due process does "not [protect] against government action that is 'incorrect or ill-advised'") (citing and quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)), *aff'd*, 447 F. App'x 267 (2d Cir. 2012) (summary order).

Substantive due process protection "limits what the government may do in both its legislative . . . and its executive capacities." *Cnty. of Sacramento*, 523 U.S. at 846.  The criteria by which courts "identify what is fatally arbitrary differ depending on whether . . . legislation or a specific act of a governmental officer . . . is at issue." *Id.*  Where the challenged conduct is legislative in nature, "a plaintiff must show both (1) that he had a valid [liberty or] property interest . . . , and (2) that the defendants infringed that [liberty or] property interest in an arbitrary or irrational manner." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001).[6]

The right to pursue a profession is a liberty interest for which one enjoys substantive due process protection.  *See Allgeyer v. Louisiana*, 165 U.S. 578, 589 (1897) (holding that "the 'liberty' mentioned in th[e] [Fourteenth Amendment] . . . is deemed to embrace the right of the citizen . . . to earn his livelihood by any lawful calling"); *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 95, (2d Cir. 2003) (noting that "the right to pursue a lawful calling has long been recognized as a fundamental right" and citing *Allgeyer*); *Madera v. Bd. of Educ. of City of N.Y.*, 386 F.2d 778, 784 (2d Cir. 1967) (quoting *Allegeyer*'s recognition that the Fourteenth Amendment protects one's ability "to earn his livelihood by any lawful calling; [and] to pursue any livelihood or avocation"); *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d

---

[6] The conduct Hund challenges—supplemental guidance related to Executive Orders issued pursuant to New York Executive Law § 29-a—is legislative.  *See infra* Section III.D.2.  So the Court first must consider whether Hund has a cognizable liberty interest affected by the incidental-music rule.

320, 339 (E.D.N.Y. 2014) (noting that "a person's right to pursue the profession of his choice is recognized as a constitutionally protected liberty interest"); *Karan v. Adams*, 807 F. Supp. 900, 907 (D. Conn. 1992) (recognizing that state licensure requirements may deprive a candidate of substantive due process).

But not every state action that affects one's efforts to pursue his profession violates his substantive due process rights. Some courts have held that "one must have no ability to practice one's profession at all . . . to state a claim for deprivation of a liberty interest." *Marino*, 18 F. Supp. 3d at 339 (holding that plaintiff did not state a substantive due process claim, even where it was "undeniable that [d]efendants' actions made it more difficult for [p]laintiff," because "[d]efendants did not fully preclude [p]laintiff from engaging in her chosen profession"); *see also Weidner v. City of N.Y.*, No. 16 CV 6935 (RMB), 2017 WL 2984021, at *4 (S.D.N.Y. June 20, 2017) (holding that plaintiff did not plead a "recognized liberty interest to engage in any of the common occupations of life" because the "challenged action . . . d[id] not appear to 'effectively prohibit[] [him] from engaging in a profession, or pursuing any job in a given field'" (citation omitted)); *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 169 (E.D.N.Y. 2009) (holding that the right to pursue a chosen occupation "is not absolute," and "it is only when the challenged action effectively prohibits one from engaging in a profession, or pursuing any job in a given field that there is a deprivation entitled to protection").

On the other hand, some courts allow substantive due process claims to proceed on less than complete inability to pursue one's chosen profession. For

example, the Second Circuit held that "a specific deprivation of [plaintiff's] opportunity to seek employment caused by a statutory impediment established by the state" supported a substantive due process claim.  *See Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (holding that plaintiff stated a claim by alleging she would be unable to get a job in the child-care field after her name was listed—as required by statute—on a register of child abusers, even though employers retained the ability to hire plaintiff).  And the Fifth Circuit held that a plaintiff has "the right to . . . the liberty to operate a legitimate business, free from arbitrary deprivation by [state officials,]" and that a substantive due process claim could proceed if state officials' conduct "sought to . . . significantly alter her liberty . . . interest[]" in her business.  *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 702-04 (5th Cir. 1991).

Hund alleges that the incidental-music rule impermissibly interferes with his right to pursue an economic livelihood by performing live music.  *See* Dkt. 1 ¶ 12; Dkt. 22, at 26.  Because Hund alleges an adverse impact on his ability to pursue his chosen profession, and because this discrete issue is both legally and factually undeveloped by the parties, the Court concludes, at this 12(b)(6) juncture, that Hund pleads a liberty interest sufficient to survive Bradley's motion to dismiss.  *See Valmonte*, 18 F.3d at 1001.

The Court next must consider whether Bradley infringed Hund's liberty interest in an arbitrary or irrational manner.  As discussed above, the incidental-

music rule fails review under *Jacobson*.  *See supra* Section III.C.1.  The rule therefore is arbitrary.

At this stage, Hund's substantive due process claim survives Bradley's motion to dismiss.  The Court denies Bradley's motion to dismiss Hund's substantive due process claim without prejudice to revisit this legal issue later in the case, based on further factual development and exploration of the boundaries of the relevant case law.

### 2.    Procedural Due Process

Procedural due process protection ensures that "an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" *Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)).

Whether official action is subject to the Due Process Clause's procedural requirements depends on whether the action was legislative or adjudicative.  *See Interports Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994).  Action "legislative in nature is not subject to the [Due Process Clause's] notice and hearing requirements." *Id.*  But adjudicative action is.  *See id.*

To determine if official action is legislative or adjudicative, courts "focus[]on the function performed by the decisionmaker." *RR Vill. Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204 (2d Cir. 1987).  Adjudicative action involves "a decision . . . based on a determination of 'facts about the parties and their activities, businesses, and properties.'" *Id.* at 1205 (citation omitted).  It "adjudicate[s]

26

disputed facts in particular cases." *Id.* (quoting *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973)) (internal quotations omitted).  Legislative action, on the other hand, has "general application and look[s] to the future." *Interport Pilots Agency*, 14 F.3d at 143.

The incidental-music rule is legislative in nature.  *See supra* note 6.  It is part of the SLA Guidelines, which generally applies to all SLA-licensed establishments.  Neither the incidental-music rule, nor the SLA Guidelines generally, involve particular facts regarding Hund—or anyone else affected by them.  And the rule, when promulgated, looked forward, requiring future compliance.

Because the incidental-music rule is legislative, the Due Process Clause's procedural protections do not apply.  Hund's procedural due process claim is dismissed.

### E.    Hund's Equal Protection Claim

The parties dispute whether Hund pleads an equal protection claim.  The complaint does not delineate or separately plead an equal protection claim and mentions "equal protection" only once.  *See* Dkt. 1 ¶ 23.  Without deciding whether this is sufficient to plead a claim, the Court addresses it here because the parties briefed the merits of Hund's equal protection claim, and because that claim fails on the merits in any event.

The Fourteenth Amendment's Equal Protection Clause precludes a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV.

On Hund's equal protection claim, the question is whether the incidental-music rule improperly differentiates among people.  Hund argues that he is a member of a protected class: "those directly impacted by the Incidental Music Rule who have been deprived of '[t]he right to pursue a lawful calling' . . . ."  Dkt. 22, at 30 (citation omitted).[7]  He appears to argue that the protected class he belongs to is musicians whose live performances are "the draw itself."  *See* Dkt. 22, at 30.[8] Because such musicians do not comprise a protected class for equal protection purposes, Hund does not—and cannot—plausibly allege an equal protection claim. *See Garanin v. New York City Hous. Pres. & Dev.*, 673 F. App'x 122, 124 (2d Cir. 2016) (summary order) (concluding that plaintiff "failed to plausibly allege a[n] equal protection claim because self-employment does not define a protected class").

Hund's claim also would fail if he were proceeding on a class-of-one theory because all similarly-situated individuals—musicians whose performances are "the draw itself"—are treated the same under the incidental-music rule.  *See Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 49 (2d Cir. 2018) (holding that a class-of-one "plaintiff must be '*prima facie* identical' to the persons alleged to receive irrationally different treatment" and concluding that drivers of for-hire vehicles and taxi drivers were not "*prima facie* identical" (citation omitted)); Dkt. 22, at 30.  None

---

[7] To the extent Hund claims that the incidental-music rule discriminates against *venues* where live, advertised, ticketed musical performances may be held, he is not the proper plaintiff to raise that claim.

[8] Hund confirmed this theory at oral argument.

of them may perform advertised, ticketed shows.  Hund specifically disclaims a class-of-one claim.  *See* Dkt. 22, at 30.  In any event, his equal protection claim fails.

### F.    Hund's Takings Claim

The Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V. It applies to the states by way of the Fourteenth Amendment.  *See Kelo v. City of New London, Conn.*, 545 U.S. 469, 472 n.1 (2005).

Hund claims that the incidental-music rule constitutes a taking of his property, for which he seeks damages and prospective injunctive relief.  *See* Dkt. 1 ¶¶ 40-46.  The Court dismissed the damages portion of his claim pursuant to the Eleventh Amendment.  *See supra* Section III.B.2.  All that remains now is his claim for injunctive relief.

But Hund may not obtain injunctive relief if a process is available through which he may obtain compensation for any taking.  *See Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2176 (2019) ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."); *Va. Hosp. & Healthcare Ass'n v. Kimsey*, No. 3:20CV587-HEH, 2020 WL 5947887, at *4 (E.D. Va. Oct. 7, 2020) (holding that plaintiffs could not "seek[] injunctive relief . . . because they may bring an action seeking just compensation, as has been an available remedy for nearly 150 years"); *Atwood v. Strickler*, No. 3:19-CV-01699-IM, 2020 WL 3549662, at *5 (D. Or. June 29, 2020) (holding that plaintiffs were "barred from seeking injunctive relief from th[e] [c]ourt under

the takings claim" because "compensation remedies are available to [p]laintiffs in a state court proceeding"); *Pro. Beauty Fed'n of Cal. v. Newsom*, No. 2:20-CV-04275-RGK-AS, 2020 WL 3056126, at *8 (C.D. Cal. June 8, 2020) (holding that "damages—not injunctive relief—are the proper remedy for a taking").

Hund does not allege that he is without a process for obtaining compensation for any taking.  And New York law provides a procedure through which he can obtain compensation for any taking.  *See 520 E. 81st St. Assocs. v. New York*, 780 N.E.2d 518, 519-20 (N.Y. 2002) (explaining the New York Court of Claims determined the compensation plaintiff was owed, where the duration and existence of the taking were not at issue); *In re City of N.Y.*, 887 N.Y.S.2d 776, 778-81 (Sup. Ct. Kings Cnty. 2009) (explaining procedure that applies to takings claims in New York).  Accordingly, the Court also dismisses the injunctive-relief portion of Hund's takings claim.

## IV.   <u>Hund's Motion for a Preliminary Injunction</u>

### A.   **Preliminary Injunction Standard**

Hund seeks preliminary injunctive relief.  Specifically, he asks the Court to enjoin Bradley from enforcing the incidental-music rule.

Generally, a party seeking preliminary injunctive relief "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  Where the

preliminary injunction "would stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party "must satisfy the more rigorous prong of 'likelihood of success'" at step two. *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

The standard may be further heightened if "(i) an injunction would alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995). If either scenario applies, a plaintiff must show "a clear or substantial likelihood of success on the merits" at step two. *See N. Am. Soccer League*, 883 F.3d at 37 (internal quotations and citation omitted); *Tom Doherty Assocs.*, 60 F.3d at 35.

When deciding whether an injunction is mandatory and would alter the status quo, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)) (internal quotations omitted). The court also considers whether the injunction would "command[] some positive act"—rather than prohibit some act—by the defendant. *Mastrovincenzo*, 435 F.3d at 89 (quoting *Tom Doherty Assocs.*, 60 F.3d at 34). An injunction that enjoins a defendant from enforcing a regulation "clearly prohibits, rather than compels, government action by enjoining the future enforcement." *Id.* at 90.

31

Moreover, the heightened standard does not apply to "any [request for an] injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." *Tom Doherty Assocs.*, 60 F.3d at 34. Instead, the heightened standard applies when the injunction "will render a trial on the merits largely or partly meaningless, either because of temporal concerns"—like a case involving a live, televised event scheduled for the day the court granted preliminary relief—"or because of the nature of the subject of the litigation"—like a case involving disclosure of confidential information. *Id.* at 35. If a preliminary injunction "will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial," then the heightened standard applies; "[o]therwise, there is no reason to impose a higher standard." *Id.*

Here, Hund seeks a preliminary injunction "enjoining [Bradley] . . . from enforcing the restrictions set forth in, or purportedly deriving authority from, Executive Order 202 *et seq.*, namely the 'Incidental Music Rule' as defined in Plaintiff's moving papers, as against Plaintiff." Dkt. 7-2 ¶ 1. This request seeks to prohibit Bradley from enforcing the incidental-music rule; it does not seek an order requiring him to act. In other words, Hund seeks to restore the status that existed before Bradley implemented and enforced the incidental-music rule. He therefore seeks a prohibitory—not a mandatory—injunction.

And relief remains available to Bradley if he prevails at trial on the merits. If Bradley prevails, the Court could vacate the preliminary injunction and allow him to again enforce the incidental-music rule.

Thus, for Hund, the standard remains that he must demonstrate: (1) irreparable harm; (2) a likelihood of success on the merits; and (3) that a preliminary injunction is in the public interest.  *See N. Am. Soccer League*, 883 F.3d at 37; *Bronx Household of Faith*, 331 F.3d at 349.

## B.    Likelihood of Success on the Merits

Hund must establish that he is likely to succeed on the merits of at least one of his claims to obtain a preliminary injunction.  *See Bronx Household of Faith*, 331 F.3d at 349.  For the reasons discussed in Section III.C, *supra*, he likely will succeed on the merits of his First Amendment claim.

The Court's motion-to-dismiss analysis focused on the pleadings to test legal sufficiency—though the Court reviewed Dr. Dufort's declaration and noted that it did not require dismissal of Hund's First Amendment claim.  *See supra* note 5.  The Court carefully considered Dr. Dufort's declaration in connection with Hund's motion for a preliminary injunction.  In particular, the Court considered Dr. Dufort's explanation that live, advertised, ticketed performances pose the following risks that incidental music does not: (1) coordinated arrival and departure times; (2) congregation and mingling; (3) length of time spent at the venue and related increase in alcohol consumption; (4) number of patrons; and (5) singing or shouting by patrons.  *See* Dkt. 20 ¶¶ 68, 69, 73, 74, 82, 83, 84, 95.

Because the occupancy restrictions, table-distancing/barrier requirements, employee and patron face-covering requirements, CDC and Department of Health cleaning and disinfecting guidelines requirements, and the 12-foot distance

requirement for performers apply regardless of the incidental-music rule, the Court concludes that the incidental-music rule both makes arbitrary distinctions unrelated to public health and is not narrowly tailored.  Dr. Dufort's declaration does not change the Court's conclusion regarding Hund's First Amendment claim.

The Court therefore concludes that Hund is likely to succeed on the merits of his First Amendment claim.  As such, the Court need not consider whether Hund is likely to succeed on his other claims.

## C.    Irreparable Harm Absent Preliminary Injunctive Relief

As stated above, the Court focuses its preliminary injunction analysis on Hund's First Amendment claim.  "Where a plaintiff alleges injury from a rule or regulation that directly limits [First Amendment rights] the irreparable nature of the harm may be presumed."  *Bronx Household of Faith*, 331 F.3d at 349.

Hund alleges that the incidental-music rule violates his First Amendment rights by foreclosing his ability to play live music at advertised, ticketed events.  *See* Dkt. 1 ¶¶ 29-33.  This effect on his First Amendment rights is direct.  *See Bronx Household of Faith*, 331 F.3d at 349 (noting that regulation prohibiting artists from exhibiting or selling their work without a license directly limited their First Amendment rights).

The Court concluded that Hund stated a First Amendment claim sufficient to survive a motion to dismiss, and that he is likely to succeed on his claim.  *See supra* Sections III.C, IV.B.  Accordingly, Hund established that he will suffer irreparable harm absent an injunction.  *See Bronx Household of Faith*, 331 F.3d at 350 ("Since

[defendant's] policy . . . led to the denial of the church's request to rent space . . . and directly limits plaintiffs' speech, irreparable harm may be presumed."); *Bery*, 97 F.3d at 693-94 ("By the very nature of their [First Amendment] allegations, . . . appellants have met the [irreparable harm] prong of the [preliminary injunction] test.").

### D.   Public Interest

Finally, the Court must consider whether a preliminary injunction is in the public interest. *See Bronx Household of Faith*, 331 F.3d at 349.

Bradley argues that preliminary injunctive relief would conflict with the public interest because it would hamper New York's efforts to ease restrictions while mitigating the risk of COVID-19 spread. *See* Dkt. 13-1, at 15-16.  But, as discussed above, ample protective measures—such as venue- and table-capacity limitations, distancing requirements, and face-covering requirements—exist that are independent of the incidental-music rule and would be unaffected by the preliminary injunction Hund seeks.  So a preliminary injunction would not harm the public interest in mitigating COVID-19 spread.

A preliminary injunction would, however, serve the public interest of ensuring that only narrowly tailored and permissible time, place, or manner restrictions are imposed on speech and expression.  The Court therefore concludes that a preliminary injunction would be in the public interest.

### E.    Security

Federal Rule of Civil Procedure 65(c) requires the Court to consider whether it should require Hund to post security and, if so, in what amount.  *See Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement [in certain situations].").

At oral argument, the Court asked Bradley whether it should require Hund to post security, should Hund prevail on his motion.  Bradley responded that security was not necessary because the preliminary injunction would not have a financial impact, and security would not mitigate any harm that might result from the preliminary injunction.

Accordingly, the Court will not require Hund to post security.  *See Dr.'s Assocs.*, 107 F.3d at 135-36 (affirming district court's decision not to require security where the district court "found that [defendants] would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases").

## <u>CONCLUSION</u>

For the above reasons, the Court grants in part and denies in part Defendants' motion to dismiss (Dkt. 13), as follows:

- Grants Defendants' motion and dismisses, without prejudice, all claims against Defendant Cuomo, pursuant to Federal Rule of Civil Procedure 12(b)(1);

- Grants Defendants' motion and dismisses, without prejudice, Hund's takings claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6);

- Grants Defendants' motion and dismisses, with prejudice, Hund's procedural due process claim, pursuant to Federal Rule of Civil Procedure 12(b)(6);

- Grants Defendants' motion and dismisses, with prejudice, Hund's equal protection claim, pursuant to Federal Rule of Civil Procedure 12(b)(6);

- Denies Defendants' motion to dismiss Hund's First Amendment claim; and

- Denies, without prejudice to revisit, Defendants' motion to dismiss Hund's substantive due process claim.

The Court grants Hund's motion for a preliminary injunction (Dkt. 7-2), as follows: Bradley, and all other governmental and/or law enforcement authorities under his control, are enjoined from enforcing the incidental-music rule portion of the New York State Liquor Authority's Phase 3/4 Guidelines for Licensed On-Premises Establishments, which provides: "Additionally, please note that only incidental music is permissible at this time.  This means that advertised and/or ticketed shows are not permissible.  Music should be incidental to the dining experience and not the draw itself."  *See* Dkt. 9-2 ([https://sla.ny.gov/phase3-guidelines-for-on-premises-licenses](https://sla.ny.gov/phase3-guidelines-for-on-premises-licenses)).

Nothing in this order precludes Bradley from enforcing other portions of the SLA Guidelines not specifically referenced above, or from enforcing any Executive Order.  In other words, Bradley may continue to enforce the unaffected portion of the SLA Guidelines as follows:

> **Q: Can I have live entertainment or a DJ in my indoor or outdoor dining area?**
>
> A:  Restaurants and other on premises food and beverage establishments that have a license through the SLA are only allowed to offer on-premise music if their license certificate specifically allows for such activity (i.e., live music, DJ, recorded, etc.). A manufacturer that has an on premises license also must assure that its on premises license certificate specifically allows for the type of music it is offering.  A manufacturer without a separate on premises license may offer music unless its license certificate specifically prohibits such music.
>
> If offering music, indoors or out, all relevant aspects of the respective Department of Health guidance dining must be followed, e.g., patrons should not be standing except for necessary reasons (e.g., restroom, entering/exiting), standing patrons should wear face coverings, etc.  Performers should be at least 12 feet from patrons.
>
> All other forms of live entertainment, such as exotic dancing, comedy shows, karaoke etc., are not permissible currently regardless of phase.

SO ORDERED.


Dated:      November 13, 2020
            Buffalo, New York


            _____
            JOHN L. SINATRA, JR.
            UNITED STATES DISTRICT JUDGE